UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AUDREY KINDLE,

      Plaintiff,                  Civil Action No. 15-14373

         v.                   District Judge STEPHEN J. MURPHY, III
                                Magistrate Judge R. STEVEN WHALEN

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Audrey Kindle ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  The parties have filed cross-motions for summary judgment.  Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).  For the reasons discussed below, I recommend that Defendant's Motion for Summary Judgment be DENIED, and that Plaintiff's Motion for Summary Judgment be GRANTED to the extent that the case be remanded to the administrative level for further proceedings.

-1-

## PROCEDURAL HISTORY

On July 18, 2012, Plaintiff applied for DIB and SSI, alleging disability as of January 31, 2012 (Tr. 199-208).  Following the initial denial of benefits, Plaintiff requested an administrative hearing, held on June 18, 2014 in Oak Park, Michigan (Tr. 34).  Patricia S. McKay, Administrative Law Judge ("ALJ") presided.  Plaintiff, represented by attorney Andrea Hamm,  testified (Tr. 39-73), as did Vocational Expert ("VE") Erin O'Callaghan (Tr. 73-82).  On July 22, 2014, ALJ McKay found Plaintiff not disabled (Tr. 23-29).  On October 29, 2014, the Appeals Council denied review (Tr. 1-6). Plaintiff filed suit in this Court on December 17, 2015.

## BACKGROUND FACTS

Plaintiff, born April 13, 1962, was 52 when ALJ McKay issued her decision (Tr. 29, 200).  She completed a GED and worked as a home health aide and laborer (Tr. 272).  She alleges disability as a result of anxiety, depression, degenerative disc disease, glaucoma, and rheumatoid and osteoarthritis (Tr. 217).

### A.    Plaintiff's Testimony

Plaintiff offered the following testimony:

She lived by herself in an elevator accessible third-floor apartment (Tr. 39).  She was right-handed, stood 5' 3" and weighed around 135 pounds (Tr. 40).  In addition to the GED, she had taken electronics courses at Wayne County Community College but had not finished the program (Tr. 40).  A "C" student, she completed a pharmacy assistant program at Kaplan

University in 2010 but did not feel that she had enough training to be a pharmacy assistant (Tr. 41). She completed the training but declined to pay $200 to obtain a certificate (Tr. 42). She was not accepted into the military due to left ear deafness (Tr. 42).

Plaintiff currently performed "seasonal" housekeeping work for Wayne County, Michigan requiring her to sweep, mop, and vacuum (Tr. 43). The position paid $10.74 an hour and she worked anywhere between 24 and 32 hours a week (Tr. 43). She stated that the work caused body pain resulting from arthritis, rheumatoid arthritis, and fibromyalgia (Tr. 44). She reported some recent improvement in symptoms of rheumatoid arthritis, but otherwise experienced level "10" pain on a scale of 1 to 10 constantly (Tr. 44-45). She required the use of a right hand brace due to thumb joint problems brought about by rheumatoid arthritis (Tr. 46). She had not received a diagnosis of glaucoma but had been prescribed "multifocal" glasses and experienced dry eyes (Tr. 47). She took Cymbalta both for anxiety and the physical problems (Tr. 48). She had not sought mental health treatment (Tr. 48). She also experienced arthritis of the knees, ankles, and toes (Tr. 49).

Her former work as a home health aide required her to sweep and mop (Tr. 50). She also performed "temp jobs" including concession stand work, a packaging position, cashiering, and census work (Tr. 51-52). She was unable to do the census work for more than a month due to difficulty climbing stairs (Tr. 52). She had been given Flexeril for joint pain, but experienced the side effect of sleepiness (Tr. 52). NSAIDs made her break out into hives (Tr. 59). She used public transportation to get to appointments (Tr. 56).

On a typical day, she made coffee, performed personal care tasks, prayed, took her vitamins and medication, then sat down and waited for the medication to start working (Tr. 56). She then took a long hot shower to relieve her joint pain, and then walked around the house to avoid joint stiffness (Tr. 57). She then performed tasks such as going outside to get air, feeding the birds, going to the grocery store or library, and taking out the garbage (Tr. 57). She was supposed to work Monday through Friday for Wayne County, but her supervisors allowed her to take time off to go to appointments (Tr. 57). She typically worked four days a week (Tr. 58). Her employers gave her a cart to carry her tools (Tr. 58). Plaintiff smoked between 10 to 15 cigarettes each day to relieve stress (Tr. 60-61). She did not drink or use street drugs (Tr. 61). She reiterated that she experienced extreme pain while working even part time (Tr. 62).

In response to questioning by her attorney, Plaintiff reported that in addition to two scheduled work breaks, her supervisors allowed her to take "two or three extra ones, in between" each day (Tr. 63). She experienced difficulty hoisting the cart, emptying buckets, stooping to empty trash cans, and lifting large trash bags (Tr. 64). She experienced problems with the concession stand work due to hand joint problems (Tr. 64). She would be unable to perform her former work as a packager at present due to hand swelling (Tr. 64). She took Norco during her work shift to control symptoms (Tr. 65). In addition to the aforementioned problems, she also experienced arthritis of the neck (Tr. 66). She was unable to stand in one place for more than one hour (Tr. 67). She could lift up to 35 pounds but experienced

gripping problems (Tr. 68). She was unable to lift more than 15 pounds without pain (Tr. 68). Due to the bus schedule, she was required to get up for work at 3:00 a.m. and did not return home until 6:30 p.m. (Tr. 69). Typically, after arriving at home she would take a pain pill, return telephone calls, and eat dinner before retiring (Tr. 69).

Plaintiff was able to sleep, at most, six hours a night due to anxiety (Tr. 70). She experienced panic attacks in groups of more than a few people (Tr. 70). As a result of depression, she experienced crying jags and at work, often went into the bathroom to cry (Tr. 70). Her slow work pace irritated other employees who felt that she was making more work for them (Tr. 71).

### B.    Medical Evidence

#### 1.    Treating Sources

In September, 2006, Plaintiff sought emergency treatment for neck pain (Tr. 341-344). An x-ray of the cervical spine showed joint space loss at C6-C7 with evidence of osteoarthritis (Tr. 341).

July, 2012 treating records by Detroit Community Health Connection note a reduced range of hip motion and Plaintiff's report of ongoing knee, finger, and ankle pain (Tr. 499). She was referred for pain management treatment (Tr. 500). August, 2012 emergency records for headaches and right jaw swelling state that she was "anxious" but were negative for a gait disturbance (Tr. 393, 397). Plaintiff reported a history of anxiety, arthritis, and fibromyalgia (Tr. 394). Emergency records note that she appeared anxious but was able to walk

independently and exhibited a normal range of motion and full strength in all extremities (Tr. 395-396, 398-399, 410).

Treating records from the same month note that a recent prescription for Cymbalta was "working" but that Plaintiff still experienced some degree of right knee and back pain (Tr. 497). December, 2012 emergency records related to a dental emergency note a normal effect and the ability to walk without difficulty (Tr. 430, 436, 444). Plaintiff reported a history of psychological problems, fibromyalgia, and arthritis (Tr. 433). She was prescribed antibiotics and directed to low-cost pharmacies in the area (Tr. 438).

February, 2013 records by Detroit Community Health Connection state that Plaintiff experienced back and knee discomfort but had not sought pain clinic treatment due to lack of funds (Tr. 495). She was prescribed Cymbalta for fibromyalgia (Tr. 496). Treating records note the presence of rheumatoid arthritis but a full range of motion (Tr. 496). April, 2013 records note Plaintiff's report of an allergy from Neurontin (Tr. 493). She was prescribed Tramadol and re-prescribed Cymbalta (Tr. 493). May, 2013 records note "c/o pain in knees (10)" (Tr. 491). She was prescribed Vicodin (Tr. 492). June, 2013 imaging studies of the right hand showed mild degenerative arthritis (Tr. 503). Imaging studies of the right knee showed minor spurring but were otherwise normal (Tr. 504). August, 2013 records from Detroit Receiving Hospital note a diagnosis of arthritis but that Plaintiff was ambulatory (Tr. 367, 466). Plaintiff reported current prescriptions for Vicodin and Cymbalta (Tr. 470). Imaging studies of the right hand showed minimal osteoarthritic changes (Tr.

379).  Imagining studies of the lumbar spine showed mild osteoarthris with subchondral scoliosis at L4-L5 and L5-S1 (Tr. 380).  Studies of the bilateral knees showed mild sublaxation, greater on the right (Tr. 381).

On June 14, 2014, treating staff at University Physicians Group prescribed a right hand splint  (Tr. 513).  Plaintiff was diagnosed with polyarthragia, back pain, and osteoarthritis (Tr. 510).  She was given referrals for occupational therapy and pain management (Tr. 511).  A work release note states that she could return to work without medical restrictions the following day (Tr. 512).

### 2.  Non-Treating Sources

In December, 2012, Florence E. Thomas, M.D. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's report of a depression diagnosis in 2000 and the current prescription for Cymbalta, which also relieved symptoms of rheumatoid arthritis (Tr. 345).  Plaintiff reported occasional swelling of the knees, ankles, hands, and wrists and arm numbness (Tr. 346).

Dr. Thomas observed a normal gait and range of motion, full muscle strength, and no evidence of rheumatoid arthritis (Tr. 347-349).  She noted that Plaintiff's pain was managed with narcotic medication and that anxiety, depression, and fibromyalgia symptoms were treated with Cymbalta (Tr. 347).  Also in December, 2012, Michele Leno, Ph.D. found that Plaintiff's conditions of depression and anxiety were non-severe based on the lack of treatment records and her activities of daily living (Tr. 102).  Imaging studies of the lumbar

spine and knees from the following month show "minimal" degenerative changes (Tr. 353).

The same month, Milagros Flores, M.D. found that Plaintiff's physical limitations were non-severe (Tr. 101).

### D.  Vocational Expert Testimony

VE Erin O'Callaghan found that although Plaintiff held several jobs, the only job that amounted to substantial gainful activity ("SGA") was the temporary employment (Tr. 74). She classified the temporary work as unskilled and exertionally medium[1] (Tr. 74).  The VE found that the Kaplan University pharmacy assistant training would not give Plaintiff any direct entry to jobs (Tr. 74).  ALJ McKay then posed the following question to the VE, describing a hypothetical individual of Plaintiff's age, education, and work experience with the following limitations:

> Our hypothetical person would have the residual functional capacity to perform the full range of medium exertional work, but she has some additional limitations to be considered.  This person can only engage in postural activities such as climbing stairs, crouching, crawling, kneeling, stooping, bending, on a frequent, not constant, basis, and she could occasionally encounter workplace hazards, which would be dangerous moving machinery, climbing ladders,

---

[1]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

those types of things.  As far as her upper extremities, she could use those on a frequent, again not constant, basis for activities such as grasping or handling, or fingering or feeling.  With those limitations, would the hypothetical claimant be able to perform the job of general laborer, either as performed by Ms. Kindle or as generally performed in the national economy?" (Tr. 75).

The VE testified that the above limitations would allow for the past work as a laborer as well as the "other work" of stocker  (6,000 positions in southeastern Michigan) and general laborer or packing positions (10,000) (Tr. 75-76).   The VE testified further that if the same individual were limited to exertionally light work, she could perform the jobs of bench assembler (6,000) and inspector (10,000) (Tr. 76).  The VE found that if the individual were limited to sedentary work, she could perform the position of sedentary bench assembler (3,000) and sorter (1,500) (Tr. 77).   She testified further that if the same individual were limited to occasional contact with the public or coworkers, the stocker numbers would be reduced to 4,000 (Tr. 77).   However, the VE stated that if the individual required additional work breaks throughout the day, or, required two or more absences each month, all unskilled work would be eliminated (Tr. 77-79).  The VE stated that if Plaintiff's testimony were fully credited, she would be unable to perform any work due to the alleged need to be off task during the workday (Tr. 79-80).   The VE stated her testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("DOT") and  *Selected Characteristics of Occupations* ("SCO") (Tr. 80).

### D.  The ALJ's Decision

At Step One, the ALJ found that Plaintiff's part-time work did not constitute

Substantial Gainful Activity (Tr. 25). At Step Two, ALJ McKay noted the "medically determinable impairments" of "degenerative disc disease of the cervical spine; degenerative arthritis of the right hand; osteoarthritis of the facet joints at L4-S1 bilaterally; degenerative joint disease of the knees with smal tibial spur on the right; cholelithiasis; hysterectomy; dental abcess; and sinusitis" but found that none of the conditions created work-related impairment (Tr. 25-26).

The ALJ according "little weight" to Plaintiff's claims of limitation (Tr. 28). She cited Plaintiff's testimony that she could lift between 15 and 35 pounds (Tr. 28). The ALJ noted that Plaintiff had not been prescribed psychotropic medication or sought mental health treatment (Tr. 28). The ALJ cited the non-examining mental and physical health assessments stating that Plaintiff's conditions were non-severe (Tr. 28). She found that "[t]o what degree the claimant's alleged limitations are supported by the medical evidence of record, they are taken into consideration and accounted for in the residual functional capacity" (Tr. 29).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S.

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has

the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes four separate arguments for remand. First, she argues that Dr. Flores January, 2013 non-examining conclusion that the physical problems were non-severe (Tr. 101) did not have benefit of the subsequently created records. *Plaintiff's Brief,* 8, *Docket #12,* Pg ID 571. She notes that the vast majority of treating records post-date the non-examining evaluation. *Id.* at 8-11 (*citing* Tr. 355-515). She argues, in effect, that the ALJ erred by adopting Dr. Flores non-examining conclusion over the later treating records.

Plaintiff argues second that the ALJ failed to accord controlling weight to the treating "opinions"; third, that the ALJ erroneously found non-disability at Step Two; and last, that she erred by failing to consider the non-severe medical conditions in assessing Plaintiff's abilities. *Id.* at 12-19.

Plaintiff's argument that the ALJ over-relied on the earlier, non-treating sources provides grounds for remand. Her second argument that the treating records, by themselves, constitute "treating opinions" is not well-taken. The transcript does not contain a treating opinion of limitation or disability, or an assessment of the work-related abilities by a treating source. *See* 20 § 404.1527(a)(2)("Medical opinions are statements from physicians and

-12-

psychologists or other acceptable medical sources that reflect judgments about the nature and severity of the impairment(s), including . . . symptoms, diagnosis and prognosis" and what one "can still do despite impairment(s), and [the]physical or mental restrictions").  By any account, the treating records do not contain an "opinion."

Given the presence of multiple additional errors in the administrative findings, discussed in Section **B**., below, the Court will omit discussion of Plaintiff's third and fourth arguments.

### A. The ALJ's Reliance on the Earlier, Non-examining Findings

The ALJ's controlling reliance on the non-treating findings that predate most of the treating records constitutes error.

In many cases, the favoring of older acceptable medical opinions that do not reflect a review of the pertinent newer records may constitute reversible error.  "When an ALJ relies on a non-examining source who 'did not have the opportunity to review' later submitted medical evidence, especially when that evidence 'reflects ongoing treatment,' we generally require 'some indication that the ALJ at least considered these [new] facts before giving greater weight to an opinion that is not based on a review of a complete case record.'" *Brooks v. Commissioner of Social Sec.,* 531 Fed.Appx. 636, 642 (C.A.6 (Ky.),2013)(*citing Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 409 (6th Cir.2009).

While the ALJ's reliance on the earlier non-treating findings to support the Step Two determination of disability is not intrinsically improper, the subsequent treating records support the finding that the medically determinable conditions created some level of work-

related limitation.   In February, 2013, Plaintiff reported back and knee pain and was prescribed pain medication and Cymbalta (Tr. 495).  She noted that she was unable to afford pain specialty treatment recommended by her treating source (Tr. 495).  She reported level "10" knee pain in May, 2013 and the following month, an imaging study of the right hand and right knee showed evidence of mild arthritis (Tr. 503-504).  An x-ray of the lumbar spine also showed mild osteoarthritis (Tr. 380).  Imaging studies of the knees performed in August, 2013 showed some degree of sublaxation (Tr. 381).

While the ALJ provided some discussion of the newer treating records, as discussed below, her rationale for adopting the earlier findings is based on a mischaracterization of both the newer records and the Plaintiff's testimony.   Moreover, the subsequent treating records showing some degree of limitation constitute the "bulk" of the transcript.  As such, the earlier non-treating opinions are not based on a complete picture of Plaintiff's condition.

### B.  Other Grounds For Remand

The ALJ's over-reliance on the earlier, non-treating findings led to additional errors.

First,  the imaging studies support a diagnosis of arthritis and some degree of work-related limitation resulting from ongoing joint pain.   While the ALJ found that neither arthritis nor fibromyalgia were severe impairments, the treating records noting a diagnosis of the conditions, coupled with the long-term use of pain medication for arthritis and Cymbalta for the fibromyalgia, cast doubt on the ALJ's Step Two finding.

At Step Two, "impairment or combination of impairments . . . found 'not severe' and

a finding of 'not disabled' is made . . . when medical evidence establishes only a slight abnormality or [] combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 WL 56856,*3 (1985). "In the Sixth Circuit, the severity determination is 'a *de minimis* hurdle in the disability determination process." *Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir.February 22, 2008)(*citing Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir.1998)). "The goal of the test is to 'screen out totally groundless claims.'" *Id.* (*citing Farris v. Secretary of Health & Human Services*, 773 F.2d 85, 89 (6th Cir.1985)).

Accordingly, the treating records showing more than "slight abnormalities" undermine the determination that Plaintiff's limitations were groundless.

Second, while the ALJ claims that the subsequent records and Plaintiff's testimony supported the Step Two finding, the discussion of the evidence relies in significant part on mischaracterizations of the record. For example, while the ALJ cited Plaintiff's testimony that she could lift up to 35 pounds (Tr. 28), she ignored her accompanying testimony of gripping difficulties and the inability to lift more than 15 pounds *without pain* (Tr. 68).

Likewise, although the ALJ accorded "little weight" to Plaintiff's testimony of "10/10" pain because the treating records did not contain such claims, she overlooked the May, 2013 treating records showing treatment for level "10" knee pain (Tr. 491). The ALJ relied on a June, 2014 treating statement that Plaintiff could return to work without restrictions to support the conclusion that Plaintiff did not experience any degree of work

-15-

restriction (Tr. 28).  However, the work release note  (apparently written for the benefit of Plaintiff's employer)  appears to be a "work excuse" for the day of the appointment rather than a broad statement that Plaintiff did not experience any work restrictions.

Third, the ALJ provided no indication that she considered that the limited treatment records were attributable to Plaintiff's financial limitations rather than a lack of symptomology.  Aside from Plaintiff's testimony of extreme financial need, the treating records show that her care was compromised by such constraints.  In December, 2012, she was referred to a low-cost pharmacy (Tr. 438).  In February, 2013, she reported to a treating source that she had not followed through on a referral to pain management specialists due to her lack of "funds" (Tr. 495).  Although Plaintiff was referred for pain management and occupational therapy in June, 2014, the records do not show that she received such treatment (Tr. 511).

Moreover, while the records contain x-rays studies, Plaintiff was unable to undergo CT or MRI scans necessary for a full evaluation of the back and knee conditions.  Pursuant to SSR 96–7p, 1996 WL 374186, *7 (1996), an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *See also* SSR 82–59, 1982 WL 31384, *4 (1982) (ALJ must consider an individual's claim that she is unable to afford the prescribed treatment).

Upon remand, evidence supporting Plaintiff's apparent inability to afford recommended treatment should be considered in making the credibility determination.

Fourth, the ALJ referenced Plaintiff's current ability to perform part-time work in making the Step Two finding but did not consider whether the work activity, as described, actually supported the finding that she could perform competitive employment.  To be sure, the ability to work on even a part-time basis can be used to support a finding that a claimant is capable of full-time work. *Herron v. Commissioner of Social Security,* 2016 WL 8115406, at *8 (E.D.Mich. July 6, 2016).  Further, the ALJ recognized that the part-time work did not constitute substantial gainful activity (Tr. 25).

Nonetheless, the ALJ's reliance on the work activity to support the non-disability finding requires a remand for further review.  The part-time work, as described by Plaintiff, suggests that she was able to continue working due only to the accommodations of her employers.  She testified that she was allowed to skip work as needed to keep appointments and was permitted to take unscheduled breaks as required (Tr. 57, 63).  Even more tellingly, Plaintiff testified that she was shunned by coworkers because her inability to keep up with her duties created more work for them (Tr. 70-71).

Whether Plaintiff's work activity constituted "accommodated" work is pertinent to the non-disability findings.  *See* 20 C.F.R. § 404.1573(c) ("[i]f your work is done under special conditions, we may find that it does not show that you have the ability to do substantial gainful activity").  The factors to be considered in whether the claimant

-17-

performed "sheltered work" consist of the following:

> (1) You required and received special assistance from other employees in performing your work; (2) You were allowed to work irregular hours or take frequent rest periods; (3) You were provided with special equipment or were assigned work especially suited to your impairment; (4) You were able to work only because of specially arranged circumstances, for example, other persons helped you prepare for or get to and from your work; (5) You were permitted to work at a lower standard of productivity or efficiency than other employees; or (6) You were given the opportunity to work despite your impairment because of family relationship, past association with your employer, or your employer's concern for your welfare. § 404.1573(c).

Plaintiff's testimony that her slow job pace created more work for other employees, that she was permitted to take time off for appointments, could take frequent unscheduled rest periods if required, and, that her job performance was substandard supports the finding that she meets the first, second, and fifth prongs of the "sheltered" work inquiry.  The ALJ's finding that the work activity undermined the disability claim, absent any consideration of whether the work was "accommodated," requires a remand for further fact-finding (Tr. 28-29).

Fifth, the ALJ's findings are clouded by the following statement: "[t]o what degree claimant's alleged limitations are supported by the medical evidence of record, they are taken into consideration and accounted for in the residual functional capacity assessment [("RFC)] set forth above" (Tr. 29).  However, the administrative opinion does not contain an RFC.  As acknowledged by the ALJ in the introductory "boilerplate," the RFC (describing a claimant's maximum work abilities) is determined between Steps Three and Four of the administrative analysis (Tr. 24)("Before considering step four of the sequential evaluation process, the

-18-

undersigned must first determine the claimant's [RFC]"); 20 C.F.R. §§ 404.1520(d), 416.920(d)). The ALJ terminated the analysis at Step Two on the basis that Plaintiff did not experience any work-related impairments. The ALJ's statement that Plaitiff's credible claims of limitation were taken into account in crafting the (nonexistent) RFC implies that Plaintiff experiences some degree of work-related impairment. The ALJ's Step Two finding that Plaintiff did not experience any degree of work-related limitation and the later finding that the credible limitations had been factored into the "RFC" are internally inconsistent. For this reason as well, a remand is required.

Finally, the determination of whether Plaintiff experiences some degree of exertional limitation is particularly critical given her status as an individual "closely approaching advanced age" at the time of the administrative decision. In the "closely approaching" age group (50 to 55), a finding that she was limited to exertionally sedentary, unskilled work would generally result in a disability finding. 20 C.F.R. part 404, subpart P, App. 2, Rule 201.14. Moreover, Plaintiff will reach "advanced age" on April 13, 2017. Rule 202.06 of the same regulation directs a finding of disability for an individual 55 or over (advanced age) who is limited to exertionally light or sedentary, unskilled work. Plaintiff's allegations that she is unable to lift more than 15 pounds without pain would limit her, at most, to exertionally light work. 20 C.F.R. § 404.1567.

The final question is whether to remand for further fact-finding or an award of benefits. The Sixth Circuit has held that it is appropriate to remand for an award of benefits

when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171 (6th Cir. 1994). Despite the presence of errors requiring remand, multiple questions of fact remain and the administrative findings require clarification. Accordingly, I recommend that the case be remanded for further proceedings rather than an award of benefits.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be DENIED, and that Plaintiff's Motion for Summary Judgment be GRANTED to the extent that the case be remanded to the administrative level for further proceedings.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D.

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                s/R.Steven Whalen
                                 R. STEVEN WHALEN
                                 UNITED STATES MAGISTRATE JUDGE
Date: February 16, 2017